UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
  :
JIAN ZHANG et al., :
  :
                Plaintiffs, :
  :    11 Civ. 3388 (JMF)
     -v- :
  :    OPINION AND ORDER
BAIDU.COM INC., :
  :
                Defendant. :
  :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/27/2014

JESSE M. FURMAN, United States District Judge:

In this suit, a group of New York residents who advocate for increased democracy in China sue one of China's largest companies, Baidu, Inc. (incorrectly named in the Complaint as "Baidu.com Inc."). Plaintiffs contend that Baidu, which operates an Internet search engine akin to Google, unlawfully blocks from its search results here in the United States articles and other information concerning "the Democracy movement in China" and related topics. (Compl. (Docket No. 1) ¶¶ 14, 22). The case raises the question of whether the First Amendment protects as speech the results produced by an Internet search engine. The Court concludes that, at least in the circumstances presented here, it does. Accordingly, allowing Plaintiffs to sue Baidu for what are in essence editorial judgments about which political ideas to promote would run afoul of the First Amendment. Baidu's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is therefore GRANTED, and the Complaint is dismissed.

# BACKGROUND[1]

The following facts, which are taken from the Complaint unless otherwise noted, are assumed to be true for purposes of this motion. *See, e.g.*, *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011). Baidu operates a Chinese search engine service called Baidu.com, through which it "offers multiple services to locate information, products and services using Chinese-language search terms, such as, search by Chinese phonetics, advanced search, snapshots, spell checker, stock quotes, news, images, video, weather, train and flight schedules and other local information." (Compl. ¶ 13). As of 2010, Baidu purported to be "the third largest search engine service provider in the world and the largest in China, with an estimated more than 70% share of the Chinese-language market." *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp.2d 312, 314 (S.D.N.Y. 2010) (citing Baidu's complaint).

Plaintiffs, self-described "promoters of democracy in China through their writings, publications and reporting of pro-democracy events," allege that Baidu conspires to prevent "pro-democracy political speech" from appearing in its search-engine results here in the United States. (Compl. ¶¶ 7-8, 10-12, 14-16, 20). Specifically, Plaintiffs claim that Baidu

> censor[s] and block[s] from search engine results any article, publication, video, audio and any information in whatever format if its content deals with the Democracy movement in China or any of the following topics that are related to the Chinese Democracy movement: The June 4th Movement, The Jasmine Revolution, The Jasmine Movement; The China Democracy Party National Committee and the Tiananmen Square Incident or movement.

(Compl. ¶ 22). Plaintiffs claim that Baidu engages in this "censorship" at the behest of the People's Republic of China ("China"), which was named as a defendant in the Complaint but was never served and is no longer a party to the case. (Compl. ¶ 23; *see* Docket No. 55).

---

[1] This case has been the subject of two prior opinions by the Court, *see Jian Zhang v. Baidu.com Inc.*, 932 F. Supp. 2d 561 (S.D.N.Y. 2013); *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508 (S.D.N.Y. 2013), familiarity with which is assumed.

Each Plaintiff has published — on the Internet — articles, video recordings, audio recordings, or other publications regarding the democracy movement in China. (Compl. ¶¶ 24-47). Although such publications appear in results returned by other search engines, such as Google and Bing, they do not appear in Baidu's search results because Baidu deliberately blocks them. (*Id.*). On these bases, Plaintiffs bring eight claims: (1) conspiracy to violate their civil rights, pursuant to 42 U.S.C. § 1985; (2) violation of their civil rights on the basis of race, pursuant to 42 U.S.C. § 1981; (3) violation of their civil rights under color of state law, pursuant to 42 U.S.C. § 1983; (4-7) denial of their right to equal public accommodations, in violation of New York Civil Rights Law §§ 40 and 40-c, New York Executive Law § 296(2), and New York City Administrative Code § 8-107(4)(a); and (8) denial of the equal protection of the laws guaranteed by New York Constitution Article 1, § 11. (Compl. ¶¶ 48-70). Plaintiffs seek $16,000,000 in damages, plus attorney's fees and costs. (Compl. ¶¶ 71-72).[2]

## LEGAL STANDARD

The standard of review for a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is the same as that governing motions to dismiss under Rule 12(b)(6). *See, e.g.*, *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). A plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In applying this standard, a court must assume all of the plaintiff's "factual allegations to be true and draw[] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

---

[2]   Although somewhat unclear, the Complaint also suggests that Plaintiffs seek unspecified "declaratory and injunctive relief." (Compl. ¶ 4; *see also* Compl. ¶ 2. *But see* Compl. ¶ 72.)

## DISCUSSION

The question of whether search-engine results constitute speech protected by the First Amendment has been the subject of vigorous academic debate.  *See, e.g.*, James Grimmelmann, *Speech Engines*, 98 Minn. L. Rev. 868 (2014); Stuart Minor Benjamin, *Algorithms and Speech*, 161 U. Pa. L. Rev. 1445 (2013); Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495 (2013); Michael J. Ballanco, Comment, *Searching for the First Amendment: An Inquisitive Free Speech Approach to Search Engine Rankings*, 24 Geo. Mason U. C.R. L.J. 89 (2013); Eugene Volokh & Donald M. Falk, *Google First Amendment Protection for Search Engine Search Results*, 8 J.L. Econ. & Pol'y 883 (2012); Oren Bracha & Frank Pasquale, *Federal Search Commission? Access, Fairness, and Accountability in the Law of Search*, 93 Cornell L. Rev. 1149 (2008); Josh Blackman, *What Happens if Data Is Speech?*, 16 U. Pa. J. Const. L. Online 25 (2014).  By contrast, it has garnered relatively little attention from courts.  To date, only two courts appear to have addressed the question, both concluding (albeit with somewhat sparse analysis) that search-engine results are indeed protected by the First Amendment.  *See Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003).[3]  It is therefore a question of first impression in this Circuit.

Although the Supreme Court has not addressed the precise question at issue, its First Amendment jurisprudence all but compels the conclusion that Plaintiffs' suit must be dismissed.  The starting point for analysis is *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974), in which the Court held that a Florida statute requiring newspapers to provide political candidates with a right of reply to editorials critical of them violated the First Amendment.

---

[3]     Curiously, Baidu cites neither these decisions nor the scholarship referenced above.

"Although the statute did not censor speech in the traditional sense — it only required newspapers to grant access to the messages of others," the Court "found that it imposed an impermissible content-based burden on newspaper speech." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 653 (1994). The Court noted that, "in practical effect, Florida's right-of-reply statute would deter newspapers from speaking in unfavorable terms about political candidates" and that it also "induced the newspaper to respond to the candidates' replies when it might have preferred to remain silent." *Id.* at 654. In both respects, the statute impermissibly infringed the newspaper's First Amendment right to exercise "editorial control and judgment." *Tornillo*, 418 U.S. at 258.

The Court later reinforced that principle, and extended it well beyond the newspaper context, in *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557 (1995). The question in *Hurley* was whether Massachusetts could "require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey." *Id.* at 559. The Court held that allowing the state to do so would "violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573; *see also, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1 (1986) (plurality opinion) (relying on *Tornillo* to invalidate a rule requiring a privately owned utility to include with its bills an editorial newsletter published by a consumer group critical of the utility's ratemaking practices). "'Since all speech inherently involves choices of what to say and what to leave unsaid,'" the Court explained, "one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley*, 515 U.S. at 573 (quoting *Pac. Gas & Elec. Co.*, 475 U.S. at 11, 16 (plurality opinion)). Notably, the Court found that principle applied even though the

5

parade organizers did not themselves create the floats and other displays that formed the parade and were "rather lenient in admitting participants." *Id.* at 569. "[A] private speaker," the Court stated, "does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech. Nor . . . does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication." *Id.* at 569-70.

Taken together, those decisions establish several principles relevant to this case. First, as a general matter, the Government may not interfere with the editorial judgments of private speakers on issues of public concern — that is, it may not tell a private speaker what to include or not to include in speech about matters of public concern. *See also Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (internal quotation marks omitted)). Second, that rule is not "restricted to the press, being enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers." *Hurley*, 515 U.S. at 574. Third, the First Amendment's protections apply whether or not a speaker articulates, or even has, a coherent or precise message, and whether or not the speaker generated the underlying content in the first place. *See generally Zalewska v. Cnty. of Sullivan, N.Y.*, 316 F.3d 314, 319 ("To be sufficiently imbued with communicative elements [to warrant protection under the First Amendment], an activity need not necessarily embody a narrow, succinctly articulable message, but the reviewing court must find, at the very least, an intent to convey a particularized message along with a great likelihood that the message will be understood by those viewing it." (internal quotation marks omitted)). And finally, it does not matter if the Government's intentions are noble — for example, to promote "press

responsibility," *Tornillo*, 418 U.S. at 256, or to prevent expression that is "misguided, or even hurtful," *Hurley*, 515 U.S. at 574; *see also Turner*, 512 U.S. at 640 ("[T]he mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards . . . ."). Put simply, "[d]isapproval of a private speaker's statement" — no matter how justified disapproval may be — "does not legitimize use of the [Government's] power to compel the speaker to alter the message by including one more acceptable to others." *Hurley*, 515 U.S. at 581.

In light of those principles, there is a strong argument to be made that the First Amendment fully immunizes search-engine results from most, if not all, kinds of civil liability and government regulation. *See, e.g.*, Benjamin, *supra*, at 1458-72; Volokh & Falk, *supra*, at 884-92. The central purpose of a search engine is to retrieve relevant information from the vast universe of data on the Internet and to organize it in a way that would be most helpful to the searcher. In doing so, search engines inevitably make editorial judgments about what information (or kinds of information) to include in the results and how and where to display that information (for example, on the first page of the search results or later). *See generally* Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J.L. & Tech. 188, 192 (2006) (concluding that "search engines make editorial judgments just like any other media company"). In these respects, a "search engine's editorial judgment is much like many other familiar editorial judgments," such as the newspaper editor's judgment of which wire-service stories to run and where to place them in the newspaper, the guidebook writer's judgments about which attractions to mention and how to display them, and Matt Drudge's judgments about which stories to link and how prominently to feature them. Volokh & Falk, *supra*, at 884; *accord* Benjamin, *supra*, at 1467-71.

On that theory of the First Amendment's protection of search-engine results, the fact that search engines often collect and communicate facts, as opposed to opinions, does not alter the analysis.  As the Supreme Court has held, "the creation and dissemination of information are speech within the meaning of the First Amendment.  Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs."  *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011); *see also* Volokh & Falk, *supra*, at 889-90 (noting that the First Amendment "protects the collection and communication of facts as much as it protects opinions, including facts that are not ideologically laden — such as names of crime victims in three-sentence crime reports, names of accused juvenile offenders, lists of bestselling books, lists of tenants who had been evicted by local landlords, information in a mushroom encyclopedia, recipes in a cookbook, and computer program source code" (citing cases)).  Nor does the fact that search-engine results may be produced algorithmically matter for the analysis.  After all, the algorithms themselves were written by human beings, and they "inherently incorporate the search engine company engineers' judgments about what material users are most likely to find responsive to their queries."  Volokh & Falk, *supra*, at 884; *see also id.* at 888-90; Benjamin, *supra*, at 1470.  In short, one could forcefully argue that "what is true for parades and newspaper op-ed pages is at least as true for search engine output.  When search engines select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are engaging in fully protected First Amendment expression — '[t]he presentation of an edited compilation of speech generated by other persons.'"  Volokh & Falk, *supra*, at 891 (quoting *Hurley*, 515 U.S. at 570).

In contrast to that robust theory of the First Amendment in this context, some scholars have relied on the Supreme Court's decision in *Turner* — which Plaintiffs here do not cite — to

advocate for a lower level of protection of search-engine results. *See, e.g.*, Bracha & Pasquale, *supra*, at 1191-94.  In *Turner*, the Court reviewed regulations requiring cable operators to carry the signals of a specified number of local broadcast television stations, and applied only intermediate scrutiny.  *See* 512 U.S. at 662.  Significantly, the Court began its analysis by stating that "[t]here can be no disagreement on an initial premise": that cable operators, "by exercising editorial discretion over which stations or programs to include in its repertoire" — that is, by exercising editorial discretion over speech created by others — themselves "engage in and transmit speech" protected by the First Amendment.  *Id.* at 636 (internal quotation marks omitted).  Nevertheless, the Court held that an intermediate level of scrutiny was appropriate for several reasons: first, because cable operators were mere "conduit[s] for the speech of others, transmitting it on a continuous and unedited basis to subscribers," *id.* at 629; *see id.* at 654-55; second, because cable operators had the ability to shut out some speakers, "giv[ing] rise to the Government's interest in limiting monopolistic autonomy in order to allow for the survival of broadcasters who might otherwise be silenced and consequently destroyed," *Hurley*, 515 U.S. at 577;  and third, because the regulations at issue were content-neutral, as they did not "impose[] a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator has selected or will select," *Turner*, 512 U.S. at 644.  That is, although acknowledging that the cable operators were engaged in speech, the Court granted lesser protection to that speech because of its less expressive nature, the technological quasi-monopoly in the marketplace of ideas enjoyed by the cable companies, and the fact that the regulations did not discriminate on the basis of content.  Taking these rationales as lodestars, some scholars argue that search-engine results should also be afforded lesser protection under the First Amendment.

This Court, however, need not resolve the scholarly debate in order to decide the present motion because, whether or not the First Amendment shields all search engines from lawsuits based on the content of their search results, it plainly shields Baidu from Plaintiffs' claims in this lawsuit.[4] Here, the very theory of Plaintiffs' claims is that Baidu exercises editorial control over its search results on certain political topics — namely, by disfavoring expression concerning "the Democracy movement in China" and related subjects. (Compl. ¶ 22). In other words, Plaintiffs do not — and, in light of their own allegations, cannot — make any argument that Baidu is merely an "infrastructure or platform that delivers content" in a neutral way. Bracha & Pasquale, *supra*, at 1192-97 (arguing that because "search engines do not function as publishers or editors of the content to which they channel users," their results should not be treated as speech covered by the First Amendment).[5] Instead, they seek to hold Baidu liable for, and thus punish Baidu for, a conscious decision to design its search-engine algorithms to favor certain expression on core political subjects over other expression on those same political subjects.[6] To allow such a

---

[4] Given the allegations in this case, there is also no need to address whether laws of general applicability, such as antitrust laws, can be applied to search engines without implicating the First Amendment. *Compare* Benjamin, *supra*, at 1482, 1487-92, *with* Volokh & Falk, *supra*, at 895-99. Nor is there any need to address whether a search engine could be held liable for false statements concerning its methodology or search results. *Cf., e.g.*, *Connecticut v. Moody's Corp.*, No. X04HHDCV106008836S, 2012 WL 2149408, at *9 (Conn. Super. Ct. May 10, 2012) (holding that a state civil-enforcement action against a bond-rating agency for false statements about the manner in which the agency operated its business was not barred by the First Amendment even if the underlying ratings themselves enjoyed First Amendment protection).

[5] As discussed below, whether any search engine is — or can be — the neutral conduit of information that Bracha and Pasquale describe is open to question, *see, e.g.*, Benjamin, *supra*, at 1469-70, 1485-86; Volokh & Falk, *supra*, at 898-99, but it need not be addressed here.

[6] That Plaintiffs allege that Baidu exercises editorial judgment "in cooperation with and according to the policies and regulations of" China makes no difference to the analysis. (Compl. ¶ 14). Plaintiffs allege that Baidu "purposely designs its systems and search engines to exclude" specific content. (Compl. ¶ 16). Whether it does so at the behest, or in furtherance of the interests, of China does not bear on the nature or extent of Baidu's First Amendment rights.

suit to proceed would plainly "violate[] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 573; *see also, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S. Ct. 2321, 2327 (2013) ("[F]reedom of speech prohibits the government from telling people what they must say." (internal quotation marks omitted)).

That conclusion is compelled as much by *Turner* as it is by *Tornillo* and *Hurley*. First, in light of *Turner*, "[t]here can be no disagreement" that Baidu is "engage[d] in and transmit[s] speech" and is thus "entitled to the protection of the speech and press provisions of the First Amendment" because Plaintiffs' own theory is that the company "exercise[s] editorial discretion" over its search results and thereby "seek[s] to communicate messages on a wide variety of topics and in a wide variety of formats." 512 U.S. at 636 (internal quotation marks and alterations omitted). Second, *Turner*'s three principal rationales for applying a lower level of scrutiny to the must-carry cable regulations — namely, that cable companies were mere conduits for the speech of others, that they had the physical ability to silence other speakers, and that the regulations at issue were content-neutral — are inapplicable here. With respect to the first rationale, it is debatable whether any search engine is a mere "conduit" given the judgments involved in designing algorithms to choose, rank, and sort search results. *See, e.g.*, Benjamin, *supra*, at 1469-70, 1485-86; Volokh & Falk, *supra*, at 898-99. But whether or not that proposition is true as a general matter, it is plainly "not apt here," as Plaintiffs' own allegations of censorship make clear that Baidu is "'more than a passive receptacle or conduit for news, comment, and advertising.'" *Hurley*, 515 U.S. at 575 (quoting *Tornillo*, 418 U.S. at 258). As Plaintiffs themselves allege, for example, Baidu "purposely designs its search engine algorithms

11

to exclude any pro-democracy topics, articles, publications, and multimedia coverage." (Compl. ¶ 20).

The second rationale, too, has no application here, as search engine operators (at least in the United States and given today's technology) lack the physical power to silence anyone's voices, no matter what their alleged market shares may be. *See* Volokh & Falk, *supra*, at 897-98. As Plaintiffs' own publications make clear (Compl. ¶¶ 24-47), Baidu does not have the ability to block "pro-democracy" writings from appearing on the Internet in this country altogether; it can only control whether it will help users find them. And if a user is dissatisfied with Baidu's search results, he or she "has access, with just a click of the mouse, to Google, Microsoft's Bing, Yahoo! Search, and other general-purpose search engines, as well as to almost limitless other means of finding content on the Internet, including specialized search engines, social networks, and mobile apps." Volokh & Falk, *supra*, at 898. In fact, Plaintiffs themselves acknowledge that their pro-democracy works are widely available to the public on the Internet "via any of the well known [sic] search engines such as Google, Yahoo[,] and Bing." (Compl. ¶ 24; *see also* Compl. ¶¶ 27, 30, 32, 36, 39, 42, 46).

It is, however, *Turner*'s third rationale for applying intermediate scrutiny that puts the final nail in the coffin for Plaintiffs' claims in this case. In *Turner*, the Court concluded that the regulations at issue were content-neutral, as they did not "impose[] a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator has selected or will select." 512 U.S. at 644. By contrast, although the present case does not involve government regulation *per se*, Plaintiffs call upon the Court to impose a penalty on Baidu precisely because of what it does and does not choose to say. *See id.* at 643 (stating that government regulation that "by [its] terms "distinguish[es] favored speech from disfavored speech on the basis of the

12

ideas or views expressed [is] content based"). As the *Turner* Court made clear, however, "the First Amendment, subject only to narrow and well-understood exceptions" — inapplicable here — "does not countenance governmental control over the content of messages expressed by private individuals." *Id.* at 641. Accordingly, to allow Plaintiffs' suit to proceed, let alone to hold Baidu liable for its editorial judgments, would contravene the principle upon which "[o]ur political system and cultural life rest": "that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Id.* at 641.

Plaintiffs' arguments to the contrary are wholly unpersuasive. First, Plaintiffs assert — without citation to any legal authority — that "Baidu is not speaking," but rather "engaging in discriminatory conduct" for which it can be held liable under federal civil rights laws and New York State's public accommodations law. (Aff. Opp'n (Docket No. 50) ("Pls.' Mem.") ¶ 10). That assertion, however, is belied by Plaintiffs' own theory of the case, which is that by exercising editorial discretion, Baidu favors some "political speech" over other "political speech." (Compl. ¶ 11). *See Turner*, 512 U.S. at 636 (holding that cable operators are entitled to the protection of the First Amendment because, "by exercising editorial discretion over which stations or programs to include in [their] repertoire" — that is, by exercising editorial discretion over the speech of others — they "seek to communicate messages") (internal quotation marks and alterations omitted); *see also, e.g.*, *Hurley*, 515 U.S. at 569 ("[A] narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." (internal quotation marks and citation omitted)). Further, Plaintiffs' argument is indistinguishable from the argument rejected in *Hurley*, that the parade at issue was a public

13

accommodation subject to Massachusetts' own public accommodations law. That is, "once the expressive character" of Baidu's search results "is understood, it becomes apparent" that allowing Plaintiffs to sue Baidu based on the content of those results would have "the effect of declaring [Baidu's] speech itself to be the public accommodation." 515 U.S. at 572-73.

Second, Plaintiffs argue that, even if Baidu's search results are a form of speech, the First Amendment is not implicated because this is a private suit and thus does not involve direct government regulation. (Pls.' Mem. ¶ 12). But that argument is also flatly inconsistent with *Hurley*, which was likewise a private suit in which the plaintiffs relied on a state public accommodations law. Moreover, the Supreme Court has long made clear that the First Amendment's protections extend to private suits for money damages based on the content of speech. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964) (holding that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel," and noting that the "the pall of fear and timidity" that the threat of civil liability would impose upon those who would speak "is an atmosphere in which the First Amendment freedoms cannot survive"); *see also, e.g.*, *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (holding that "heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern"). The bottom line is that Plaintiffs seek to enlist the government — through the exercise of this Court's powers — to impose "a penalty on the basis of the content" of Baidu's speech. *Tornillo*, 418 U.S. at 256. To allow it to do so would "inescapably 'dampen[] the vigor and limits the variety of public debate.'" *Id.* at 257 (quoting *N.Y. Times Co.*, 376 U.S. at 279); *see also Langdon*, 474 F. Supp. 2d at 629-30 (dismissing First Amendment, fraud, and deceptive

business practices claims against a search engine as barred by the First Amendment); *Search King*, 2003 WL 21464568, at *4 (same with respect to a tortious-interference claim).

Third, Plaintiffs contend that Baidu's search results, if speech, are a form of commercial speech subject to "relaxed" scrutiny under the First Amendment. (Pls.' Mem. ¶¶ 9-10). "The search engine," Plaintiffs reason, "is both Baidu's product and advertisement. There are no membership requirements and no usage fees because Baidu makes money selling advertisements and sponsorships. Thus, Baidu has a profit motive to retrieve and disseminate information on its search engine, for example, by drawing traffic to its site to sell advertisement [sic]." (*Id.* ¶ 10). Commercial speech, however, is defined as "expression related *solely* to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (emphasis added); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (stating that commercial speech is "usually defined as speech that does no more than propose a commercial transaction"). That definition would presumably apply to advertisements displayed by a search engine, and might even apply to "search results shown to purposefully advance an internal commercial interest of the search provider." Ballanco, *supra*, at 90 (arguing that such results "should be classified as commercial speech and, therefore, subject to less First Amendment protection"); *see also* Volokh & Falk, *supra*, at 885 (implicitly acknowledging that paid advertisements may be entitled to less protection under the First Amendment than "search results for which no payment has been made"). But that definition plainly does not apply to the search results at issue in this case, which relate to matters of public concern and do not themselves propose transactions. And, of course, the fact that Baidu has a

15

"profit motive" does not deprive it of the right to free speech any more than the profit motives of the newspapers in *Tornillo* and *New York Times* did.[7]

In short, Plaintiffs' efforts to hold Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment. There is no irony in holding that Baidu's alleged decision to disfavor speech concerning democracy is itself protected by the democratic ideal of free speech. As the Supreme Court has explained, "[t]he First Amendment does not guarantee that . . . concepts virtually sacred to our Nation as a whole . . . will go unquestioned in the marketplace of ideas." *Texas v. Johnson*, 491 U.S. 397, 418 (1989). For that reason, the First Amendment protects Baidu's right to advocate for systems of government other than democracy (in China or elsewhere) just as surely as it protects Plaintiffs' rights to advocate for democracy. Indeed, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* at 414 (citing cases). Thus, the Court's decision — that Baidu's choice not to feature "pro-democracy political speech" is protected by the First Amendment — is itself "a reaffirmation of the principles of freedom and inclusiveness that [democracy] best reflects, and of the conviction that our toleration of criticism . . . is a sign and source of our strength." *Id.* at 419.

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings is GRANTED, and the Complaint is dismissed in its entirety.[8] Further, as any amendment would

---

[7] Even if the speech in this case did qualify as "commercial speech," it is far from clear that Plaintiffs' claims would be consistent with the First Amendment. *See Cent. Hudson*, 447 U.S. at 556 (establishing a four-part test to determine whether a commercial-speech regulation is consistent with the First Amendment). The Court need not address that question.

[8] Because the Court grants Baidu's motion on First Amendment grounds, it need not and

be futile, Plaintiffs' request for leave to amend to address any deficiencies in their Complaint is denied. The Clerk of Court is directed to terminate Docket No. 46 and close the case.

    SO ORDERED.

Dated: March 27, 2014
      New York, New York

                                              JESSE M. FURMAN
                                              United States District Judge

---

does not reach Baidu's other arguments for dismissal. (Def. Baidu, Inc.'s Mem. Law Supp. Mot. J. Pleadings (Docket No. 47) 6-8).